# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73035-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEN BUMANGLAG, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 29, 2016 |
| | ) | |

VERELLEN, A.C.J. — Based in part on evidence recovered during a search of a residence, a jury convicted Allen Bumanglag of six counts of second degree identity theft and taking a motor vehicle without permission. On appeal, Bumanglag contends his counsel was ineffective for failing to move to suppress the evidence recovered in the search. He also contends one of his six identity theft convictions and his conviction for taking a motor vehicle without permission are not supported by sufficient evidence. We affirm.

## FACTS

On March 18, 2014, a Bellevue Police Department special enforcement team staked out a residence at 7319 16th Avenue S.W. in Seattle. Their objective was to locate Eljohn Dacome and Jason Felipe and arrest them on outstanding warrants for theft and identity theft. The warrants stemmed from a 2013 search of the same residence that uncovered a large identity theft operation.

Based on events occurring during the stakeout, Bellevue Police Detective Jeffrey Christiansen applied for a warrant to search the 7319 residence. His supporting affidavit provided the following pertinent information:

> On 02-27-2013 I assisted with a search warrant at . . . 7319 16th Avenue S.W. in the City of Seattle. . . . I recovered more than one hundred items of evidence associated with [i]dentity theft, including dozens of stolen and/or fraudulently obtained credit cards, driver's licenses, [S]ocial [S]ecurity cards, and checks. . . . [T]he King County Prosecutor's Office filed criminal charges against multiple suspects located inside the residence during the time of the search warrant. Two of the suspects were Eljohn Dacome and Jason Felipe. Dacome and Felipe failed to appear in court and felony warrants were subsequently issued . . . .

> On the afternoon of 3-18-2014 I verified that Felipe and Dacome still had felony warrants out for their arrest. Bellevue police officers . . . and I responded to the area of 7319 16th Ave. S.W. to conduct surveillance [and] locate Felipe and Dacome. . . . Officer Oliden saw Dacome exit the front door of the home and walk out of his view toward the back yard where a small living structure is located. . . . I saw Dia Tacardon . . . exit the front door of the home and also walk out of my view toward the back yard. . . .

> . . . Officer Grannis saw Felipe and an unknown male exit the front door of the residence. Felipe was carrying a camera in his left hand and was carrying a black-colored satchel over his right shoulder. The unknown male was carrying an orange-colored backpack . . . . Officer Grannis observed Felipe and the unknown male enter the driver and front passenger door . . . of a beige-colored Honda Accord, WA#AGT5853. The Honda was reported stolen to Seattle P.D. on 03-16-2014 . . . . Felipe and his passenger, later positively identified as Allen Bumanglag, began traveling in a southeast direction in the stolen Honda. . . . Officer Schafer activated his vehicle's emergency lights and siren to attempt to conduct a traffic stop on Felipe and Bumanglag in the stolen vehicle, however[,] Felipe refused to pull over [and] quickly accelerated to an estimated 60 miles per hour in a marked 35 mile per hour zone. . . .

> A civilian flagged down Officers Schafer and Oliden . . . . The civilian pointed out the stolen Honda and told Officer Schafer he saw two males run southwest after they abandoned the stolen vehicle. . . . [A]dditional civilians pointed out Bumanglag and said he had just run into the Shell station parking lot with another male. Officer Schafer recognized Bumanglag as the passenger of the stolen vehicle . . . . Officer Schafer placed Bumanglag under arrest for [p]ossession of a

stolen motor vehicle and [o]bstructing. Officer Schafer searched Bumanglag [and] removed a wallet from [his] pants pocket. The wallet contained Bumanglag's [S]ocial [S]ecurity card with . . . the last four digits scratched out. Bumanglag's wallet also contained a piece of paper with a handwritten [S]ocial [S]ecurity number . . . as well as a Chase deposit ticket bearing the name and address of Larina Cooper . . . . Bellevue [d]ispatch personnel ran the [S]ocial [S]ecurity number . . . and determined [it] belongs to Labinot Hasani. . . . I discovered that Hasani's wife [had] reported that unknown suspect(s) used Labinot Hasani's personal information to fraudulently open an account at Verizon Wireless . . . on 01-07-2014. The suspect(s) purchased two Apple brand iPhones and opened two lines of cell service. . . .

. . . .

. . . Officer Grannis observed Tacardon and Dacome exit the front door of the residence . . . . [Officers] placed both of them under arrest for their felony warrants. . . . Officer Grannis recovered a partial piece of a DiscoverCard financial document inside Tacardon's pants pocket. The document bore the name Angelina Iley. . . .

I know from my training and experience . . . that suspects possess personal and financial information such as other persons names, [S]ocial [S]ecurity numbers, and bank account information, for the purpose of committing identity theft by fraudulently opening accounts in other persons names both in person and online.

. . . I believe there is sufficient evidence that the crimes of Identity theft 2nd degree have occurred and that evidence of the crimes are currently located inside the premises at 7319 16th Avenue S.W. . . . and the Honda Accord . . . currently stored at the Bellevue police department.[1]

The superior court issued a search warrant for the entire property, including an outbuilding, and the stolen Honda. About six people left the residence before police executed the warrant. No one was on the premises at the time of the search.

Police searching the residence entered a locked bedroom in the outbuilding. The room was relatively neat and orderly. A red backpack hanging on a hook contained documents such as wage reports addressed to Bumanglag. It also contained dozens of financial instruments and documents belonging to other people. These included driver's

---

[1] Ex. 3 at 3-5.

licenses, credit cards, checks, a Social Security card, bank statements, income tax documents bearing Social Security numbers, insurance forms bearing Social Security numbers of adults and children, a woman's place of birth, date of admission to the United States, and alien registration number, and handwritten notes listing people's names, addresses, phone numbers, dates of birth and Social Security numbers.

Elsewhere in the bedroom, the police found school documents, tax documents, and medical documents bearing Bumanglag's name. A piece of mail bearing Bumanglag's name was dated the day before the search. Police did not find any items belonging to other suspects in the bedroom, nor did they find any items belonging to Bumanglag outside the bedroom. Police did find evidence that Dacome and Tacardon shared a different room in the outbuilding.

Police searching the Honda found a shaved Chevrolet key in the ignition. They also found the orange backpack that Officer Grannis saw Bumanglag carry to the car. A black satchel inside the backpack contained gloves, a screwdriver, and two pocketknives. The backpack also contained the registration for the stolen Honda. The vehicle's description and the owner's name were scratched off the registration.

The State charged Bumanglag with six counts of second degree identity theft and one count of second degree taking a motor vehicle without permission. Bumanglag's counsel did not move to suppress any evidence found during the searches of the house and car.

At trial, Detective Christiansen testified that he worked on the special enforcement team and had handled dozens of identity theft cases. He testified that a common method of identity theft involves groups in which individuals steal mail and

pass it along to more experienced accomplices. The accomplices then build "profiles" of their victims using Social Security numbers, dates of birth, bank account numbers, and any other personal data that might help open lines of credit or create access to bank accounts. Detective Christiansen testified that identity thieves often write profiles in notebooks or on pieces of paper which they take to stores and use to open up fraudulent accounts. Detective Christiansen also testified to his training and experience with methods of auto theft. Common methods include using shaved "jiggler" keys, screwdrivers, and other tools, including gloves.

The detective also recounted the execution of the search warrant, generally reiterating the facts he alleged in the search warrant affidavit.

Labinot Hasani, the man whose Social Security number was found in Bumanglag's wallet, testified that in early 2014, someone wrote checks and opened cell phone accounts using his name. Several other individuals testified that mail found at the 7319 residence was stolen from them. All of these victims lived or worked in the general vicinity of the 7319 residence. One victim, Ronald Svik, testified that his February bank statement never arrived and that someone subsequently made unauthorized purchases in his name for cellular phone service.

The State also presented testimony from the owner of the stolen Honda, the officers who surveilled and pursued it, the officer who arrested Bumanglag, a civilian witness to Bumanglag's flight from the Honda, and officers who participated in the search of the residence.

In closing argument, the prosecutor argued that the jury could infer that Bumanglag knew the handwritten Social Security number in his wallet belonged to a

5

real person. She maintained that documents found in Bumanglag's bedroom indicated he was engaged in collecting profiles of people he knew were real, and that the profiles and Social Security numbers would be useless in an identity theft operation if "they were for fictional people."[2] She also argued that the jury could infer that Bumanglag knew the Honda was stolen because the backpack he carried into the car contained the Honda's registration, and the registration had been altered in a manner similar to Bumanglag's own Social Security card. In addition, the prosecutor noted that Bumanglag's flight from police and his spontaneous statement that he didn't know the car was stolen also supported an inference of knowledge that the car was stolen.

The jury convicted Bumanglag as charged. He appeals

## DECISION

Bumanglag contends his counsel was ineffective for failing to move to suppress the evidence found in the residence on the ground that it was the product of an unlawful search. To establish ineffective assistance of counsel, a defendant must show both deficient performance and prejudice to the defendant's case.[3] Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness.[4] We strongly presume that counsel provided effective assistance and will not find deficient performance if counsel's conduct can fairly be characterized as legitimate trial strategy or tactics.[5] Prejudice is established if there is a reasonable probability that, but for

---

[2] Report of Proceedings (RP) (Dec. 10, 2014) at 115.

[3] Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[4] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

[5] Id. at 336; see also State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 687).

counsel's omissions, the result of the proceeding would have been different.[6] When, as here, an ineffective assistance claim is based on counsel's failure to move to suppress evidence, the defendant must show both the absence of any strategic basis for counsel's omission and the likelihood that the court would have granted the motion had it been made.[7] Bumanglag has not met this burden.

Bumanglag contends his counsel should have moved to suppress the evidence found in the residence on the ground that the search warrant was not supported by probable cause. A search warrant may be issued only upon a magistrate's determination of probable cause.[8] "'Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched.'"[9] Probable cause requires a nexus between criminal activity and the item to be seized and a nexus between the item to be seized and the place to be searched.[10] The warrant affidavit "must be tested in a commonsense manner rather than hypertechnically," and any doubts are resolved in favor of the warrant.[11] Although we defer to the magistrate's decision, the superior court's probable cause determination is a legal question we review de novo.[12] Evidence

---

[6] McFarland, 127 Wn.2d at 334-35.

[7] Id. at 334-36.

[8] State v. VanNess, 186 Wn. App. 148, 165, 344 P.3d 713 (2015).

[9] Id. (quoting State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999)).

[10] Thein, 138 Wn.2d at 140.

[11] State v. Partin, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977).

[12] State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

obtained from a warrant issued without probable cause must be suppressed under the fruit of the poisonous tree doctrine.[13]

Bumanglag claims the search warrant affidavit "did not establish that [he] lived at the premises or that it was probable that evidence of identity theft would be found there."[14] But police did not have to establish that Bumanglag lived at the residence; rather, they only needed to establish probable cause to believe that evidence of criminal activity would be found at the residence. The affidavit satisfied this requirement. It indicated that the residence had housed a large identity theft operation within the last year. More recently, two known participants in that operation were seen leaving the residence with Bumanglag and Tacardon. Shortly after leaving the residence, Bumanglag and Tacardon possessed items like those found inside the residence during the prior identity theft operation. Bumanglag possessed the Social Security number of a recent identity theft victim, a woman's bank slip, and his own altered Social Security number. Tacardon possessed part of a DiscoverCard financial document bearing the name Angelina Iley.

The affiant stated that, in his experience, people "possess personal and financial information such as other persons names, [S]ocial [S]ecurity numbers, and bank account information, for the purpose of committing identity theft by fraudulently opening accounts in other persons names both in person and online."[15] Finally, Bumanglag and Felipe left the residence in a stolen car and fled when police attempted a traffic stop.

---

[13] State v. Eisfeldt, 163 Wn.2d 628, 640, 185 P.3d 580 (2008).

[14] Appellant's Br. at 2.

[15] Ex. 3 at 5.

Viewing these allegations in a commonsense manner and resolving all doubts in favor of the warrant, we conclude that a motion to suppress for lack of probable cause would likely have failed and that Bumanglag therefore cannot establish either deficient performance or prejudice.[16]

Bumanglag also contends the evidence was insufficient to support the identity theft conviction based on his possession of a handwritten Social Security number. He argues that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly possessed a means of identification belonging to another person. We disagree.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."[17] Circumstantial and direct evidence are deemed equally reliable,[18] and "reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."[19] Here, circumstantial evidence, including the items found in the outbuilding and the backpack Bumanglag carried to the car, strongly indicated that Bumanglag was involved in an identity theft operation. The Social Security number Bumanglag possessed had

---

[16] State v. Thein, 138 Wn.2d 133, 977 P.2d 582 (1999), cited by Bumanglag, is distinguishable. Unlike the residence searched in Thein, the residence in this case had been the site of a relatively recent identity theft operation. Two members of that prior operation were seen leaving the residence in the company of persons possessing items associated with identity theft. One of the members was driving a stolen car. These facts provided probable cause to believe that evidence of identity theft would be found inside the residence.

[17] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[18] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[19] Salinas, 119 Wn.2d at 201.

recently been used to open unauthorized accounts. Viewed in context and in a light most favorable to the State, this evidence supported a reasonable inference that Bumanglag knew the Social Security number belonged to another person.

We also reject Bumanglag's contention that the evidence was insufficient to support his conviction for taking a motor vehicle without permission. Bumanglag argues that there was insufficient evidence to support an inference that he rode in the Honda knowing it was stolen. But as the State correctly points out, "[o]nce it is established that a person rode in a vehicle that was taken without the owner's permission, slight corroborative evidence is all that is necessary to establish guilty knowledge."[20] Corroborative evidence includes fleeing when stopped or the absence of a plausible explanation for legitimate possession.[21] In this case, Bumanglag not only fled from the stolen vehicle after police attempted to stop it, he entered the car with a backpack containing the true owner's vehicle registration and told police he did not know the car was stolen before anyone told him why he was under arrest. This corroborative evidence amply supports an inference that Bumanglag knew the car was stolen when he entered it.

In his statement of additional grounds for review, Bumanglag contends the trial court never ruled on his written motions to discharge his appointed counsel. Bumanglag filed two similar motions to discharge counsel before and during trial. The motions alleged that defense counsel missed most of his court dates, met with him only

---

[20] State v. Womble, 93 Wn. App. 599, 604, 969 P.2d 1097 (1999) (internal quotation marks omitted).

[21] Id.

once,[22] never discussed the case, refused to let him see discovery, and wanted him to plead guilty to offenses he did not commit. On the second day of trial, Bumanglag orally requested the same relief. The following colloquy ensued:

> DEFENDANT: Can I say something? I want to change my lawyer because he doesn't give me my discovery, the police reports, I don't get everything. I don't know what's going on right now for me.
>
> COURT: Okay. Well, first of all, if you want to change your lawyer, I'm going to send you back upstairs. You can do the motion in front of the presiding judge. [Room] 1201 is who handles those motions. So, sir, if you want -- Mr. [Defense Counsel], *has that kind of motion been heard before?*
>
> [COUNSEL]: *It has, Your Honor, and it was denied.*
>
> COURT: I assume, since you're still here.
>
> [COUNSEL]: Right.
>
> COURT: When did that occur?
>
> [COUNSEL]: That occurred -- I don't have the exact date with me because I don't have the red file that I typically write those notes in.
>
> COURT: Okay.
>
> [COUNSEL]: They're in that file. I have my trial notebook here, but that motion was made some time ago.
>
> COURT: Okay.
>
> [COUNSEL]: And there was a motion to provide him redacted discovery, but that was not granted either because that was left to the attorney in order to provide -- he's had the opportunity to review the information that I have with him while we were in custody, review all of the information that I had by reading it to him. He understood all of that, and so that's where we are at this point.

---

[22] We note that during a discussion regarding interpreters, defense counsel told the court he had seen Bumanglag "numerous times" in the jail. RP (Dec. 4, 2014) at 5. Also, Bumanglag stated in his statement of additional grounds that his counsel threatened him "during at least three of the few visits counsel made prior to trial." SAG at 7 ¶ 4.8.

. . . .

COURT: So, sir, *it sounds like the presiding judge has already heard this motion. I'm not* going to hear it again, so we're going to continue and we're going to proceed.

[PROSECUTOR]: Your Honor, . . . [w]ould the court also be finding at this time that this would be an untimely motion as we've been assigned out for trial?

COURT: Yes, it's untimely, . . . [a]nd these are handled on the 12th floor. Once they're assigned to me for trial, I presume -- *and since Mr. [Defense Counsel] has represented that this has been heard, I'm not going to hear it again.*

[PROSECUTOR]: Thank you, Your Honor.[23]

Bumanglag did not dispute his counsel's representation that his motion to discharge counsel and provide discovery were previously denied, nor did he dispute counsel's statement that he had reviewed all the discovery with Bumanglag and that Bumanglag understood it. Bumanglag argues for the first time on appeal that his counsel lied when he made these representations to the court. This claim involves matters outside the record and is therefore beyond the scope of our review.[24]

Affirmed.

WE CONCUR:

---

[23] Id. at 11-16 (emphasis added).

[24] McFarland, 127 Wn.2d at 335.